## CHRISTOPHERSEN v. DONALD S. S. CO.

## THE AURORA.

(District Court, S. D. New York. February 11, 1910.)

*(Syllabus by the Judge.)*

SHIPPING (§ 58*)—RIGHTS OF CHARTERER—BREACH OF CONTRACT—EVIDENCE.

   Mud berth for steamer at Amherst, Nova Scotia. The contract required the steamer to use a mud berth and a dispute as to whether the Fort Lawrence wharf at Amherst was a proper one, with approaches, determined in favor of the proposition advanced by the charterer, the Donald Steamship Company, that under the contract it was justified in requiring the vessel to go there.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 241; Dec. Dig. § 58.*]

In Admiralty. Actions by Anders Christophersen against the Donald Steamship Company, and by the Donald Steamship Company against the steamship Aurora. Decree for the Donald Steamship Company, with order of reference.

Convers & Kirlin, for The Aurora.

Hunt, Hill & Betts, for Donald Steamship Co.

ADAMS, District Judge. Anders Christophersen, the master of the steamship Aurora, brought the first of the above actions against the Donald Steamship Company to recover hire under a charter party of the steamer, originally dated April 5, 1907, but extended by agreement for a month at a time. She was re-delivered to the owners November 25, 1907. The balance of hire claimed is $1,038.81. There is also a claim by the libellant for the expenses of overtime of the crew of the vessel amounting to $121.22. The defence and counterclaim consist of a claim that the master of the vessel wrongfully refused to deliver the cargo of lumber from the vessel at a wharf in Amherst, Bay of Fundy, to which she was ordered by the charterer, in consequence of which the charterer sent the vessel to St. John for discharge, causing the charterer damages to the extent of $3,948.66, to which should be added the sum of $14.27, disbursed at Jacksonville, Florida, for the hire of winchmen to take the place of those which were not furnished by the steamer. The total amount of the counterclaim is $3,962.93.

The contract was on the usual form but provided also as follows:

"It is also understood that charterers have privilege of loading steamer at a mud berth at Windsor providing it is safe to do so. It is understood that steamer is to be employed in the plaster trade between Hillsboro and North of Hatteras ports, or any safe trade and in case steamer discharges at Newark Plaster Co.'s wharf at Newark, N. J., that steamer will discharge aground at low tide same as other vessels.

At Newtown Creek steamer to discharge at a perfectly safe mud berth. It is understood charterers have the privilege of loading steamer at any plaster port where she can safely load in mud berth.

At New Haven steamer to discharge at a perfectly safe mud berth if necessary."

The principal controversy is with respect to the Fort Lawrence wharf and its approaches.

It appears that the Aurora was a Norwegian steel screw steamer 237 feet long, 34 feet beam and 18 feet in depth. Her American register was 1195 tons gross and 886 tons net; her Norwegian register was 1066 tons gross and 667 tons net. The master, Christophersen, joined the vessel in Jacksonville, September 1st, she then being under the charter in this suit. She loaded at that port with fertilizer for Havana, where she proceeded and returned to Jacksonville, arriving September 21, 1907. The master was then directed to go to Amherst, and he immediately began making inquiries about that place. He was informed by the master of the schooner Theta that it was "a bad and unsafe port for a ship like the Aurora—of the Aurora's size." The master of the Theta was afterwards examined in the case as a witness for the libellant. He again said that he did not consider it prudent for a vessel of the Aurora's size to go to the Fort Lawrence wharf but he did not base his opinion on the berth itself. He said:

"Q. Now, so far as this particular berth was concerned, there was nothing to make it different from any other ordinary mud berth after you actually got there, was there? A. No; the berth, if a mud berth is level and the mud is equally hard all over, the berth is all right for a ship."

He also said that the wharf was not properly built and for that reason his vessel was strained, but his real criticism of the place was on account of the approaches, of the bend, which he estimated at being 125 yards from the end of the wharf. He had had no experience whatever with steamers, yet he said:

"Q. Then do you think that the Fort Lawrence wharf and approach was a safe place for the Aurora to go to? * * * A. No, I do not.

Q. Won't you tell me why you think so? A. I think the channel –in the first place, I think the channel is too narrow and crooked, and there is not room to navigate the ship up there with safety."

Among the other witnesses for the libellant, apart from the master and the mate of the Aurora, was the master of the steamer Garibaldi, 200 feet long, which discharged a cargo of oak lumber at the wharf. He said if he were master of the Aurora, he would not take her in as it was not safe. He further said:

"Q. Were there any rocks up on the inner channel on the approach to Fort Lawrence wharf? A. Yes; big stones; big rocks; not whole, solid rocks, but big stones; I think there were between 5 and 7, I wouldn't say, I didn't count them so particularly, but I am sure there were 5. Q. What kind of a berth did your vessel rest in alongside of Fort Lawrence wharf? A. The berth is right enough; soft berth; soft, muddy berth."

There was also called as a witness, the master of the sailing vessel Ethyl B. Sumner. He went to the Fort Lawrence wharf after the Aurora declined to enter. He also was of the opinion that the approaches were not safe. There was also the master of the schooner Kenneth C., of 475 tons register, and of a length of 140 feet keel. He said that in his judgment it was not a safe place and further:

"Q. If you were master of a steamer of that length and the matter was left to your judgment would you take her to that approach and to that wharf? * * * A. I would decline."

The foregoing is the substance of the outside testimony on behalf of the libellant.

The respondent examined numerous witnesses to show that the berth was a safe one and that the approaches were also safe. There is however very little real controversy on the first point. The respondent sent its superintendent to examine the berth in November, 1907, and ascertain if it was safe for the Alice, its own vessel, and the Aurora. He had the berth made a little wider and longer, so that it was ample for a vessel of the Aurora's size. There is no real question as to the berth. There can be no doubt that it was a safe one for the vessel.

With respect to the approaches, the preponderance of the testimony shows that with ordinarily proper management, the vessel could have reached the berth without difficulty.

It appears that before the Canadian Government began to build the Fort Lawrence wharf, the resident engineer of the Public Works Department for Western Nova Scotia, which included Amherst harbor, made a thorough inspection of the place. He examined it at low tide and found no rocks or reefs in the approach. He stated that immediately below the wharf, the river at ordinary high tide is about 425 feet between the banks; that the distance from the end of the wharf to the bend is 900 feet at which point the banks are about 600 feet apart, and in November, 1907, the channel at the bend was 425 feet wide, with a depth of 17 feet, widening as it proceeded outward; that after passing the bend inward there were no difficulties or obstructions of any kind. All of the foregoing were actual measurements made in the surveys and evidently overcome any effect which might otherwise be given to the somewhat loose estimates of the libellant's witnesses. It fully appears that the approach to the wharf was not crooked or extraordinarily narrow. There is but one bend which can be called serious and I think there can be little doubt that the Aurora could, if not with her own power, certainly with the assistance of one or two tugs, have passed safely into the inside berth, and that there was ample room in the channel for the navigation of the Aurora with assisting tugs alongside is quite clear. Of course such navigation would have to be made at high, or nearly high, tide. In fact there was room enough for her to have turned around in the channel if necessary. The photographs in evidence show something in the channel which, without explanation, might be deemed dangerous rocks but it appears that these were merely pieces of ice in the mud. There was actually nothing in the channel but very soft mud. Apart from the statements of the witnesses already mentioned, a number of others testified to practically the same facts with regard to the safety of the channel, including some steamship captains who had had actual experience at the place, in the navigation of large vessels and who knew this approach well and said it was safe, especially with the aid of a tug or tugs. Even if the Aurora should have run into the banks, which should not happen with careful navigation, she would not have been in any real danger because she could have promptly backed off, owing to the steepness of the banks. Of course the tide was swift, the rise and fall of the tide being about 40 feet and the high water had to be availed of but it only required ordinary diligence and care to reach the berth in safety. The place where the Aurora was anchored, Woody

Point, was but a short distance away, it requiring less than an hour to proceed from there to the Fort Lawrence wharf. The master of the steamer Alice said that it did not require more than a quarter of an hour to go with his vessel from the entrance to the channel to the wharf. There would have been no great difficulty with respect to the tide, as the slack water continues for from 15 minutes to half an hour. The tide falls 6 to 8 feet per hour and as there were 25 feet of water in the inside berth, the Aurora drawing 16½ feet, would have had about 2 hours to make the trip to the wharf. Though there is testimony that the Alice struck the end of the wharf in entering the second time she went there, that cannot properly be attributed to the condition of affairs at the wharf but must have been due to defective navigation. At least two experts say that there is no more danger of a vessel, if properly navigated, striking the Fort Lawrence wharf, than any other wharf.

This channel had been navigated many times by sailing vessels and it is obvious that it would be much less difficult for a steamer, as she would be easier to handle and have the power to stop and back.

It appears that the action of the master of the Aurora in refusing to proceed to the wharf selected for him was unwarranted and doubtless arose from the fact of his having concluded before reaching Amherst that he would not go into the berth. Several papers purporting to have been signed by the pilot, Willard Barnes, have been presented. He said that the master of the Aurora "lied" to him to get one of these papers signed, in which it is stated that the ship was 200 tons larger than they told him and he therefore said she was too large to enter the creek and that he "would not take her in." He said that Captain Christophersen came to his, the pilot's, place with the paper just mentioned, already prepared for signature to the effect stated and that he signed it upon the supposition that the Aurora, judging from a plaster steamer he knew of going to the wharf, was more than 250 feet long and if he had known she was only 237 feet long, he would not have signed the paper but knowing her actual dimensions would have been prepared to take her in. With respect to the aid that would be given by a tug or tugs, he said that Christophersen told him he would not take her in "if they got a dozen." In view of the conflicting statements of this pilot, I do not think much reliance should be placed upon his testimony but so far as it is entitled to any, it is clearly in favor of the respondent.

With respect to the general question as to the Fort Lawrence wharf being a proper one for the Aurora to have berthed at, there does not seem that there can be much, if any, doubt as to its being properly answered in favor of the Donald Company's contention.

The contract required the vessel to supply winchmen but, at Jacksonville, the charterer was obliged to employ shore winchmen by reason of the failure of the vessel to fulfil its contract in this respect. The cross libellant is entitled to this disbursement.

There is some question in the case about the libellant's charge for overtime, which the commissioner will take up and report upon.

There will be a decree for the Donald Steamship Company, with an order of reference.